UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

RICHARD MAXWELL LAMB,                   :
                                        :   Civil Action No.: 1:20-cv-5234
                    Plaintiff,          :
                                        :
          -against-                     :
                                        :   **<u>COMPLAINT</u>**
PAUL JOHNSON and                        :
JOHNSON TRADING GALLERY, INC.           :
                                        :   JURY TRIAL DEMANDED
                    Defendants.         :
-------------------------------------------------------------x

　　　　Plaintiff Richard Maxwell Lamb ("Lamb" or "Plaintiff"), by his attorneys Schindler

Cohen & Hochman LLP, for his Complaint against Defendants Paul Johnson ("Johnson") and

Johnson Trading Gallery, Inc. ("JT Gallery," and collectively with Johnson "Defendants")

alleges as follows:

<u>**NATURE OF THE CASE**</u>

　　　　1.　　　This action arises out of Defendants' violations of New York's Arts and Cultural

Affairs Law ("NYACAL") and other misconduct related to their unlawful possession of

hundreds of pieces of individually designed and crafted sculptural furniture created and owned

exclusively by Plaintiff, as well as funds owed to Plaintiff from the sale, damage, or loss of other

such works created by Plaintiff and consigned to Defendants.

　　　　2.　　　 In 2007, Defendants and Lamb entered into an oral agency and consignment

agreement (the "Agreement"), by which Defendants would exhibit, store, and sell Lamb's work.

The oral agreement contemplated that Defendants would receive 50% of the net sale revenue

from any work sold minus half of the production cost of that work as their commission in their

role as agents and consignees.

3.     Johnson, JT Gallery's principal and owner, approved and negotiated the terms of the Agreement and directed JT Gallery's performance (and non-performance) under the Agreement at all times.  He also personally oversaw the storage, exhibition, and sales of Lamb's work.

4.     The relationship between the parties deteriorated over the course of 2019 when Lamb discovered Johnson was not transparent about his and JT Gallery's dealings with Lamb's work and did not properly account for expenses, sales revenue, and the overall status or location of Lamb's work.

5.     Between 2007 and 2017, Lamb consigned hundreds of works to Defendants, and, until 2017, Defendants served as Lamb's exclusive representatives, agents, and consignees in the United States.

6.     In 2017, Defendants began working with and brought their business under the brand of non-party gallery Salon 94 Design LLC ("Salon 94 Design").

7.     As part of this transition, Lamb consigned all of his newly created work directly to Salon 94 Design.  The relevant works created by Lamb prior to Defendants' relationship with Salon 94 Design, had been consigned directly to Defendants and remained with Defendants, although Defendants agreed with Lamb and Salon 94 Design to re-consign these works for sale through Salon 94 Design.

8.     Between 2017 and 2019, Lamb was represented by Salon 94 Design, and continued to work with Defendants in the course of Defendants' working relationship with Salon 94 Design.[1]

---

[1]     Salon 94 Design and Defendants terminated their working relationship in 2019.  Lamb is currently represented by Salon 94 Design in the United States.

9.      In December 2019, Defendants and Salon 94 Design terminated their business relationship, including Defendants' reconsignment of Lamb's works created prior to 2017.

10.      Lamb likewise terminated his business relationship with Defendants in January 2020, at which point he sought to wind down the relationship amicably and settle all matters related to the pre-2017 works he had consigned to Defendants.  Lamb asked Johnson for an accounting of Lamb's works in Defendants' possession and funds owed to him.  To date, Defendants have not supplied this information.  As this type of accounting is required by Section 12.01 of NYACAL to be kept in the regular course of business, Defendants inability to produce such documentation in a timely manner raised serious red flags.

11.      Lamb, realizing Johnson was stalling and refusing to move forward in untangling the relationship, became increasingly worried about regaining possession of all his property— consisting of at least 147 works worth over $1.9 million— currently in Defendants' possession or control, believed to be in New York City and London (the "Warehoused Artwork").

12.      Lamb demanded Defendants return all of the Warehoused Artwork on numerous occasions between May 2020 and the filing of this complaint via text message, telephone, email, and letter to Johnson or via Defendants' attorneys.  Johnson stonewalled Lamb, saying he needed to develop a full inventory and accounting first, but then failed to deliver any such documentation.

13.      Every request by Lamb for the return of his property has been expressly rejected by Johnson on behalf of himself and JT Gallery.

14.      After Defendants hired legal counsel in June 2020, they asserted for the first time that Defendants co-own the Warehoused Artwork, and refused to return Lamb's property on this basis.  Defendants also continue to insist that the parties settle all their accounts and financial

disputes before the Warehoused Artwork can be returned to Lamb.  Defendants are thus holding the Warehoused Artwork, created and owned by Lamb, hostage in violation of NYACAL and otherwise unlawfully.

15.     Defendants have also violated and breached their statutory and fiduciary obligations by failing to pay Lamb the proceeds from at least three works sold by Defendants pursuant to the Agreement (the "Sold Artwork") and failing to account for works entrusted to Defendants and that were either sold by Defendants, damaged, or lost (the "Lost Artwork").

16.     Lamb is entitled to the immediate restitution of the Warehoused Artwork and proceeds due from the Sold Artwork, as well as compensation for the Lost Artwork, an accounting, attorneys' fees and costs, and money damages as a consequence of Defendants': (i) violation of NYACAL; (ii) breach of their fiduciary duties; (iii) aiding and abetting the breach of fiduciary duties; (iv) conversion; (v) replevin; (vi) breach of contract; (vii) breach of bailment; (viii) negligence; (ix) accounting; (x) constructive trust; and (xi) unjust enrichment.

## PARTIES

17.     Plaintiff is an individual whose principal residence is in London, England.  He is a well-known artist and craftsman specializing in the design of unique, high-end pieces of sculptural furniture.  Lamb's work is exhibited and can be purchased at major galleries in New York and London and has been exhibited and is in the permanent collections of major museums around the world.

18.     Defendant Johnson is an individual whose principal residence is in New York, New York.  Johnson is a New York City-based gallerist and the principal and owner of JT Gallery.

19.     Defendant JT Gallery is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Queens, New York.  JT Gallery is, upon information and belief, wholly owned and controlled by Johnson.  Defendants have a warehouse in Queens, New York and a storage account at Hedley's Humpers in London, England, both of which currently store the Warehoused Artwork against Lamb's wishes.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the Plaintiff is a citizen of a foreign state who is not lawfully admitted for permanent residence in the United States, Defendants are both citizens of the United States, and the matter in controversy, exclusive of interests and costs, exceeds the sum or value of $75,000.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because both Defendants are residents of New York City and reside within this District.

## FACTUAL BACKGROUND

**I.     The Agency and Consignment Agreement**

22.     Lamb is a renowned London-based high-end furniture artist and craftsman.  Each of Lamb's works is unique in design and innovative in its use of natural materials within the design.  Lamb is known for using and combining various natural materials into his works, such as stone, wood, metal, plastic, and even volcanic rock.  While his works resemble the shapes of common furniture, they are sculptural display pieces.  Lamb's works are exhibited and offered for sale through galleries in New York and London, and have been exhibited in leading art museums, including the Art Institute of Chicago, SFMOMA, Cooper Hewitt, the Victoria & Albert Museum, as well as in the Venice Biennale of Architecture.  Lamb's work is also in the permanent collections of major museums such as the Art Institute of Chicago, SFMOMA, CNAP

of Paris, the Design Museum of London, the Israel Museum, Design Museum Gent, and the Crafts Council.

23.     Johnson is a well-known, New York-based design dealer and gallerist.  He owns and operates the gallery, JT Gallery, which buys and sells works of art and design, and has represented numerous artists and designers in the role of gallerist and dealer.  In this role, Johnson, directly and/or through JT Gallery, regularly took works of art and design on consignment and acted as agent for his artists and designers in promoting and selling their work.

24.     In or around December of 2007, Lamb entered into the Agreement whereby he delivered his works to Defendants to exhibit and sell on his behalf.  As compensation, Defendants received 50% of the net sale revenue minus half of the production cost as commission when a work consigned to them by Lamb sold.  At all times, Lamb dealt directly with Johnson, who manages and controls JT Gallery, and accepted Lamb's work directly and/or on behalf of JT Gallery.

25.     As is legally required and customary in the art world, upon sale of a work consigned to them, Defendants received payment directly from the purchaser, were obliged to deliver the work to the purchaser, account for any commission owed to them, and, after deducting such commission, pay the balance of the purchase price to Lamb.

26.     Over the course of the parties' relationship, in which Defendants represented Lamb as his agents and consignees, Lamb consigned hundreds of works to Defendants worth many millions of dollars.

27.     Until 2017, Defendants exhibited Lamb's work at JT Gallery's exhibition room in Queens, New York.  In 2017, Johnson brought JT Gallery's business under the umbrella of Salon 94 Design.  At this time, Salon 94 Design became Lamb's agent and consignee, together with

- 6 -

Defendants.  After 2017, any new consignments were made directly to Salon 94 Design rather

than to Defendants, although Defendants remained the consignees and agents for Lamb's

previously created and consigned works.  For these works created between 2007 and 2017,

Defendants re-consigned them to Salon 94 Design in partnership and they shared in the proceeds

of these sales.  Lamb continued to work with Johnson closely as part of his involvement with

Salon 94 Design.

28.     During Defendants' tenure with Salon 94 Design, Defendants continued to

possess and store Lamb's work at their facility in Queens and storage unit in London.

Defendants stored post-2017 works consigned to Salon 94 Design, as part of a storage agreement

with Salon 94 Design in which Salon 94 Design paid Defendants a monthly storage fee to store

works on Salon 94 Design's behalf.  Defendants also continued to possess and store the pre-2017

works created by Lamb and consigned to them pursuant to the Agreement.

29.     At all times during his work with Defendants, Lamb was the exclusive creator,

producer, and owner of his works; Lamb never agreed to share ownership interest in any of his

works with Defendants, and Defendants have no ownership interest over such works, including

the Warehoused Artwork.

30.     Lamb paid all the production costs related to the creation of works consigned to

Defendants, although Defendants' commission was later, at the time of sale, calculated as 50%

of the sale price minus half the production costs previously paid by Lamb.

31.     At all times during their working relationship, Defendants served as Lamb's

agents and consignees pursuant to Section 12.01 of NYACAL and the common law of fiduciary

duty, bailment, and true consignment.  As such, Defendants are Lamb's fiduciaries and all work

consigned to Defendants, including the Warehoused Artwork, and the proceeds thereof, are held in trust and for the benefit of Lamb.

## II.     The Termination Of The Agency And Consignment Agreement

32.     The relationship between Lamb and Defendants deteriorated over the course of 2019 as Johnson became difficult to communicate with and was not transparent about Defendants' business dealings on Lamb's behalf or the location and sale status of the Warehoused Artwork.  Defendants maintained tight control of Lamb's pre-2017 work and failed to provide accountings to Lamb, and, upon information and belief, offered for sale certain of Lamb's works without Lamb's (or Salon 94 Design's) permission prior to and after 2017.  Upon information and belief, Defendants also misappropriated, damaged and/or lost certain works by Lamb without compensating or accounting to Lamb.

33.     In or around December of 2019, Defendants' relationship with Salon 94 Design terminated.

34.     In January 2020, Lamb definitively terminated the Agreement with Defendants and continues to be represented by Salon 94 Design in the United States.

35.     Upon the termination of Johnson's relationship with Salon 94 Design, Salon 94 Design removed from Defendants' storage Lamb's works consigned directly to Salon 94 Design beginning in 2017, although eight such works were not returned.  Johnson did not permit Salon 94 Design to remove any of Lamb's works that had been originally consigned to Defendants (*i.e.*, the Warehoused Artwork), referring to it as their own "inventory."

### III.   Post-Termination Misconduct and Communications

36.     At this time, Lamb asked Johnson to wind up the parties' affairs, initially by requesting that Johnson review an inventory Lamb put together of works he understood to be in Defendants' possession and control and/or to confirm what may have been sold or misplaced but not yet accounted for.  Johnson told Lamb that he would review the inventory Lamb drafted and go through everything.  He also suggested that Lamb might gift him several works for his archive and children as a parting gift, which Lamb did not and has not agreed to.

37.     When Johnson's inventory review and accounting was not forthcoming, Lamb told Johnson in February 2020 that he would need to retrieve his property from Defendants before waiting any longer.  On May 22, 2020, Johnson had still not provided any information to Lamb, and Lamb demanded the return of the Warehoused Artwork, which Lamb offered to arrange at his expense.  Over several communications in May 2020, Lamb continued to demand the return of the Warehoused Artwork and Johnson refused to release these works.  On May 30, 2020, Johnson texted Lamb to say he would review the inventory and would "go through everything" within a week of June 8, 2020, but did not agree to allow Lamb access to his Warehoused Artwork.

38.     Lamb and Defendants subsequently hired legal counsel and communications between the parties have since been through counsel.

39.     On June 2, 2020, Lamb, through his attorneys, sent a demand letter to Johnson to request the immediate return of the Warehoused Artwork.  Lamb's letter outlined Johnson's obligations under NYACAL as a fiduciary to Lamb and that all property consigned to Defendants and the proceeds thereof are trust property for the benefit of the consignor, Lamb.

40.     On June 16, 2020, Defendants, through their attorneys, refused to return any of the Warehoused Artwork, and explained that Defendants first required the parties to work out all other financial matters between them.  Although any financial disputes have no impact on Lamb's immediate right to possess his property, Defendants did not and still have not provided an accounting or summary of what exactly these financial matters might be or confirming what works made by Lamb they have in their possession.

41.     In this same communication, Defendants asserted for the first time that their refusal to return the Warehoused Artwork was based on Defendants' alleged co-ownership of Lamb's works, and, that, as co-owners, Defendants do not qualify as art merchants under NYACAL.  Despite these claims, Defendants confirmed that they will not move or dispose of any of the Warehoused Artwork until the disputes between the parties are fully resolved.

42.     On June 24, 2020, Defendants, through their attorneys, reiterated that they would not return the Warehoused Artwork until Defendants, apparently at their leisure, created an inventory and accounting and the parties had worked out any disputes that such accounting might reveal.

43.     Defendants, to date, have failed to account for the millions of dollars of work that were entrusted to them under the Agreement, despite requests by Lamb starting in January 2020.

44.     Defendants have also failed to pay to Lamb  the proceeds due to him for the Sold Artwork.  In addition, Defendants have not accounted for or compensated Lamb for the Lost Artwork.

45.     JT Gallery is a gallery and Johnson is a gallerist; both are dedicated to buying and selling art and design, as well as representing artists and craftsman, and, thus, fall squarely within the definition of an art merchant under NYACAL.  The relationship between Lamb and

Defendants also falls squarely within the definition of a consignment set forth in NYACAL §

12.01.  As such, Defendants were, at all times, Lamb's consignees and fiduciaries.

46.     Upon information and belief, Defendants currently hold the Warehoused Artwork,

consisting of at least 147 works worth almost two million dollars, at their warehouse in Queens,

New York and at Hedley's Humpers' storage facility in London, England.[2]

47.     Upon information and belief, Defendants have similarly taken hostage and

misappropriated the property and funds of other artists.

48.     Upon information and belief, Defendants are holding hostage and/or

misappropriating Lamb's works, including the Warehoused Artwork and Lost Artwork,

unlawfully for Defendants' own enrichment.

49.     Lamb now files this action to protect his rights and his property.

## COUNT I – BREACH OF DUTY OWED UNDER NYACAL

50.     Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

51.     Lamb consigned hundreds of works to Defendants over the course of the parties'

relationship between 2007 and 2017.  These works were delivered to Defendants to exhibit and

sell on Lamb's behalf as his agent.

52.     Defendants are art merchants as defined under NYACAL § 11.01 because they

are "in the business of dealing, exclusively or non-exclusively, in works of fine art" and as

contemplated by NYACAL § 12.01.

53.     Lamb was the sole creator, producer, and owner of all work that he delivered to

Defendants, including the Warehoused Artwork.

---

[2]      There may be additional Warehoused Artwork stored at these locations or elsewhere, of which Lamb does
not have records.

54.    By delivering his works to Defendants for exhibition and sale, a consignment and trust relationship was created under NYACAL § 12.01, under which Defendants were obligated to hold the work and all sales proceeds therefrom as trust property for the benefit of Lamb.

55.    Lamb has demanded the return of the Warehoused Artwork, the proceeds of the Sold Artwork, and the return and/or payment for the Lost Artwork and Defendants have refused such demands.

56.    Defendants have failed to pay Lamb the proceeds related to the Sold Artwork and to account for the Lost Artwork.

57.    Defendants' refusal to return the Warehoused Artwork to Lamb and any additional property held in trust for Lamb, pay proceeds due to Lamb for the Sold Artwork, and compensate Lamb for the Lost Artwork, constitutes a breach of Defendants' statutory duties.

58.    Defendants are liable for any and all losses incurred and for any and all gains foregone by Lamb as a result of Defendants' breach of their statutory duties.

59.    By reason of the foregoing, Lamb is entitled to (1) the immediate return of the Warehoused Artwork located in New York, London, or elsewhere; (2) the payment of outstanding proceeds from the Sold Artwork; (3) a full and legally sufficient accounting; (4) the restoration of all work sold or lost in breach of Defendants' fiduciary duties, including the Lost Artwork, or compensation therefor; and (6) to compensatory damages of at least $1.9 million to be determined at trial.

60.    By reason of the malicious and/or reckless nature of Defendants' conduct, Lamb is also entitled to punitive damages in an amount to be determined at trial.

61.    Pursuant to NYACAL § 12.01(3), this Court should also award reasonable attorneys' fees, costs, and expenses to Lamb.

## **COUNT II – BREACH OF FIDUCIARY DUTY**

62.     Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

63.     Defendants are Lamb's fiduciaries.

64.     Under the Agreement, Defendants were the agents and consignees of Lamb and, as such, owed Lamb the fiduciary duties of care and loyalty.

65.     Pursuant to their fiduciary duties, Defendants had the legal obligation to act only in Lamb's interest and to forgo all personal advantage aside from the agreed compensation for Defendants' services.

66.     Defendants have breached their fiduciary duties to Lamb by failing to account for millions of dollars of work that was entrusted to them, including, currently, the Lost Artwork; failing to pay Lamb the proceeds of the Sold Artwork; and failing to return the Warehoused Artwork upon demand.

67.     Defendants' misconduct has caused Lamb substantial damage by depriving Lamb of his right to dispose of the Warehoused Artwork and the Lost Artwork, as well as the proceeds from the Sold Artwork.

68.     Lamb is entitled to an order requiring Defendants to restore, at Defendants' expense, any trust property sold in breach of Defendants' trust and fiduciary duties or the monetary equivalent of such property, including but not limited to, the Lost Artwork.

69.     By reason of the foregoing, Lamb is entitled to (1) the immediate return of the Warehoused Artwork in New York, London, or elsewhere; (2) the payment of outstanding proceeds from the Sold Artwork; (3) a full and legally sufficient accounting; (4) the restoration of all work sold in breach of Defendant's fiduciary duties, including the Lost Artwork, or

compensation therefor; (6) and to compensatory damages of at least $1.9 million to be determined at trial.

70.     By reason of the malicious and/or reckless nature of Defendants' conduct, Lamb is also entitled to punitive damages in an amount to be determined at trial.

**COUNT III – AIDING AND ABETTING**
**<u>BREACH OF FIDUCIARY DUTY</u>**
**(Against Johnson)**

71.     Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

72.     Plaintiff pleads this count in the alternative to its breach of fiduciary duty claim against Johnson.

73.     JT Trading was Lamb's fiduciary and, as such, owed Lamb the fiduciary duties of care and loyalty.

74.     JT Gallery breached its fiduciary duties to Lamb by failing to account for millions of dollars of work that was entrusted to it; failing to pay Lamb the proceeds of the Sold Artwork; and failing to return the Warehoused Artwork upon demand.

75.     Johnson, the owner and principal of JT Gallery and the individual directing all of JT Gallery's actions, knowingly caused, induced, or participated in JT Gallery's breach of its fiduciary duties by, *inter alia*, failing to account for expenses, sales revenue, and the overall condition and status of the work consigned by Lamb to JT Gallery and refusing to return the Warehoused Artwork to Lamb.

76.     Johnson's substantial assistance to JT Gallery's breach of its fiduciary duties has caused Lamb substantial damage by depriving Lamb of his right to dispose of the Warehoused and Lost Artwork, as well as the proceeds from the Sold Artwork, of at least $1.9 million to be determined at trial.

77.     By reason of the malicious and/or reckless nature of Johnson's conduct, Lamb is also entitled to punitive damages in an amount to be determined at trial.

## COUNT IV - CONVERSION

78.     Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

79.     Lamb is the owner of all work entrusted and consigned to Defendants for their exhibition, storage, and sale pursuant to the Agreement, the common law of bailments, and NYACAL § 12.01.

80.     Lamb is also the rightful owner of the net proceeds from the Sold Artwork currently in Defendants' possession.

81.     Lamb is entitled to the return of the Warehoused Artwork upon termination of the parties' consignment and bailment, as well as his share of the proceeds from the Sold Artwork in Defendants' possession.

82.     Lamb terminated his agency and consignment relationship with Defendants in January 2020 and, at that time, terminated any and all bailments, consignments and/or any other authorization of Defendants to exhibit, store, and sell his work.

83.     Lamb explicitly demanded in communications with Johnson the return of the Warehoused Artwork in May 2020 and has reinstated his request numerous times since, all of which Defendants have refused.

84.     Lamb also demanded the proceeds due to him for the Sold Artwork starting in January 2020, which Defendants have also failed to provide.

85.     Defendants converted the Warehoused Artwork and proceeds of the Sold Artwork with malice and/or reckless disregard of Lamb's claim of title.

86.     By reason of the foregoing, Lamb is entitled to the immediate return of the Warehoused Artwork, the payment of proceeds from the Sold Artwork, and compensation for the Lost Artworks in an amount to be determined at trial.

87.     By reason of the malicious and/or reckless nature of Defendants' conduct, Lamb is also entitled to punitive damages in an amount to be determined at trial.

## COUNT V - REPLEVIN

88.     Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

89.     Each piece of the Warehoused Artwork held by Defendants is unique, innovative, and valuable chattel.

90.     Lamb is the owner and is entitled to the immediate possession of all of the Warehoused Artwork.

91.     Lamb delivered the Warehoused Artwork to Defendants on consignment and it remains in the possession of Defendants.

92.     Lamb has demanded the return of the Warehoused Artwork from Defendants and Defendants have refused Lamb's demands without stating where the Warehoused Artwork is located.

93.      By reason of the foregoing, Lamb is entitled to the immediate return of the Warehoused Artwork currently in New York, London, or elsewhere.

94.     By reason of the malicious and/or reckless nature of Defendants' conduct, Lamb is also entitled to punitive damages in an amount to be determined at trial.

## COUNT VI – BREACH OF CONTRACT

95.     Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

96.     Lamb and Defendants entered into the Agreement by which Defendants would exhibit, store, and sell Lamb's work in exchange for a commission.

97.     Lamb has complied with his obligations under the Agreement by providing his work on consignment to Defendants and paying the commissions owed to Defendants.

98.     Defendants breached the Agreement by, *inter alia*, failing to pay proceeds due to Lamb for the Sold Artwork, as required by the Agreement; failing to account for millions of dollars of work that were entrusted to them, including the Lost Artwork; and refusing to return the Warehoused Artwork.

99.     Defendants have caused Lamb substantial damage by depriving Lamb of his right to dispose of the Warehoused Artwork and Lost Artwork and the proceeds due to Lamb from the Sold Artwork.

100.    By reason of the above, Lamb is entitled to damages of at least $1.9 million to be determined at trial.

## COUNT VII – BREACH OF BAILMENT

101.    Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

102.    Lamb and Defendants entered into the Agreement under which  Defendants undertook to act as bailee for work created and delivered by Lamb, to sell such work for agreed-upon prices during the term of bailment, and to return unsold work upon Lamb's demand.

103.    Lamb delivered hundreds of pieces of his work to Defendants for their exhibition, sale, and storage.

104.    Lamb terminated his bailment agreement with Defendants in January 2020 and, therefore, terminated any authorization of Defendants to exhibit, store, and sell his work.

105.    Defendants have refused to return the Warehoused Artwork upon Lamb's demand.

106.    By reason of the foregoing, Defendants are in breach of bailment, and caused damage to Lamb of at least $1.9 million to be determined at trial.

107.    By reason of the malicious and/or reckless nature of Defendants' conduct, Lamb is also entitled to punitive damages in an amount to be determined at trial.

## COUNT VIII – NEGLIGENCE

108.    Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

109.    Defendants, under NYACAL § 12.01, common law fiduciary duties, and/or the common law of bailments, owe Lamb the duty to act only in Lamb's interest, to hold all of Lamb's work and proceeds thereof in trust and for the benefit of Lamb, and return all work and the proceeds thereof to Lamb upon Lamb's demand.

110.    For the reasons stated above, Defendants have breached these duties.

111.    By reason of the above, to the extent Defendants have failed to keep adequate records of their dealings with Lamb, or misplaced, lost, damaged or destroyed Lamb's work, or misplaced, lost or appropriated the proceeds thereof, Lamb is entitled to a judgment that Defendants have been negligent and such negligence has caused damages to Lamb of at least $1.9 million to be determined at trial.

## COUNT IX - ACCOUNTING

112.    Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

113.    Under the Agreement, the nature of their relationship, and NYACAL § 12.01, Defendants were Lamb's agents and owe Lamb fiduciary duties.

114.    Defendants breached such duties, with the precise damages known only to Defendants.

115.    Defendants have failed to provide a full and legally sufficient accounting of Lamb's work received by Defendants, as well as sales, claimed expenses, and commissions charged by Defendants in connection with such work.

116.    By reason of the foregoing, Lamb is entitled to an equitable accounting, which should: (1) identify with particularity all work by Lamb that Defendants have sold, or for which Defendants have collected any fee of any kind, and set forth for each such work: the date of such transaction, the name and address of the purchaser, the price for which the work was sold, and any fees collected by Defendants; (2) identify with particularity the Warehoused Artwork and Lost Artwork, namely work that remains unsold, and set forth the location at which such works are stored and/or displayed; (3) identify any work that Defendants contributed to produce and provide documentation of such expenses or contributions; and (4) provide documentation of any purported expenses allegedly incurred by Defendants or otherwise deducted from proceeds due to Lamb.

## COUNT X – CONSTRUCTIVE TRUST

117.    Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

118.    There exists a fiduciary relationship between Lamb and Defendants pursuant to NYACAL § 12.01, the common law of fiduciary duties, and the Agreement.

119.    The acceptance by Defendants of Lamb's work for consignment constitutes a promise by Defendants to discharge the duties of a fiduciary with respect to such work.

120.    Lamb expected that Defendants would carry out their responsibilities in accordance with the law and the Agreement.

121.   Defendants are unjustly enriched by their conversion of the Warehoused Artwork and proceeds of the Sold Artwork and by not accounting for the Lost Artwork.

122.   It is just and equitable that the Court impose a constructive trust upon the Warehoused Artwork, the Lost Artwork, and the proceeds of the Sold Artwork, all other trust property of Lamb, and any other assets or rights of Lamb in possession of Defendants, collectively or individually.

123.   By reason of the above, Lamb is entitled to a constructive trust on any and all property of Lamb currently in the possession of Defendants.

## COUNT XI – UNJUST ENRICHMENT

124.   Plaintiff repeats all of the foregoing allegations as if fully set forth herein.

125.   Defendants are enriched by retaining the Warehoused Artwork created by Lamb and the proceeds of sales of Sold Artwork and not accounting for the Lost Artwork.  Specifically, Defendants are enriched by continuing to keep as inventory the Warehoused Artwork and/or to the extent Defendants are personally benefiting from the proceeds of such work.

126.   Such enrichment is at the expense of Lamb.

127.   Equity and good conscience require restitution to Lamb.

128.   By reason of the foregoing, Lamb is entitled to damages of at least $1.9 million to be determined at trial.

129.   By reason of the malicious and/or reckless nature of Defendants' conduct, Lamb is also entitled to punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Richard Maxwell Lamb demands judgment against Defendants as follows:

(a)   Directing Defendants to immediately return to Plaintiff any and all of Plaintiff's works and the proceeds thereof held by Defendants in New York, London, or elsewhere;

(b)   Enjoining Defendants from moving, selling, and/or disposing of any and all works consigned to them by Plaintiff in Defendants' possession;

(c)   Directing Defendants to immediately prepare and deliver to Plaintiff an accounting as detailed herein;

(d)   Directing Defendants to keep in constructive trust any and all proceeds or property attributable to Plaintiff;

(e)   Directing Defendants to make specific reparation by restoring to the trust any trust property sold or misplaced without authorization of Plaintiff or in breach of Defendants' trust and fiduciary duties or the equivalent of such trust property;

(f)   Awarding Plaintiff compensatory damages of at least $1.9 million to be determined at trial;

(g)   Awarding Plaintiff punitive damages in an amount to be determined at trial;

(h)   Awarding Plaintiff attorneys' fees, costs, and expenses incurred in connection with this action; and

(i)   Such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff respectfully demands a trial by jury for all matters so triable.


Dated: New York, New York
         July 8, 2020

SCHINDLER COHEN & HOCHMAN LLP

By: /s/ Steven R. Schindler
Steven R. Schindler (SS-3511)
Katherine Wilson-Milne (KW-2183)
Juan Marcos Otazu Jara (JO-4222)

100 Wall Street, 15th Floor
New York, New York 10005
Tel:  (212) 277-6300
Fax:  (212) 277-6333

*Attorneys for Plaintiff Richard Maxwell Lamb*

- 21 -